UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL PATRICK FOLEY,

    *Plaintiff*,

v.

SYRIAN ARAB REPUBLIC,

    *Defendant*.

Civil Action No. 22-3508 (TJK)

**MEMORANDUM OPINION**

James Foley, an American journalist who covered the civil war and humanitarian crisis in Syria, was kidnapped, tortured, and beheaded in 2014 by the Islamic State of Iraq and the Levant, also known as the "Islamic State," "ISIS," or "ISIL." His tragic death is well-known to many Americans because of ISIS's release of a video depicting it. Plaintiff Michael Foley, his brother, sues the Syrian Arab Republic under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). Plaintiff asks the Court to find that Syria is liable to him for ISIS's hostage taking, torture, and extrajudicial killing of his brother. Relying in part on the evidence provided to the Court in *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121 (D.D.C. 2021), this Court again finds that Syria is liable for the detention, torture, and execution of James Foley at the hands of ISIS. Thus, as explained below, it will grant Plaintiff's motion for default judgment and award him $11.25 million in damages.

**I.    Background**

    **A.    Legal Background**

In *Sotloff v. Syrian Arab Republic*, this Court found Syria liable for the gruesome torture and execution of Foley, as well as for the killing of fellow American journalist Steven Sotloff. 525

F. Supp. 3d at 142. The Court held a two-day evidentiary hearing on the motion for default judgment in *Sotloff* in June 2020. *Id.* at 133. At the hearing, the Court heard from two expert witnesses: Dr. Daveed Gartenstein-Ross, an expert on "violent non-state actors generally, ISIS's evolution from its predecessor organizations, and ISIS's material supporters," and Dr. Matthew Levitt, an expert on "the Syrian government's relationship with ISIS's predecessor organizations and ISIS itself between 2010 and 2015." *Id.* Each expert also submitted a report to the Court. *Id.* at 127 n.3. The Court also received the account of Nicolas Henin, a French journalist who spent six months imprisoned alongside Foley before being released in mid-2014. *Id.* at 131.

The Court is permitted by Rule 201 of the Federal Rules of Evidence to take "judicial notice" of adjudicative facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (compiling cases). "Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Id*. And "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'" *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (citation omitted). "Thus, the factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case." *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018). That said, the Court, as it must, reaches its own, independent findings of these facts here. *Rimkus*, 750 F. Supp. 2d at 172.

The Court determines that the above-articulated approach "is both efficient and sufficiently protective of the absent defendants' interests" and will adopt it, taking judicial notice of the evidence previously presented before it in *Sotloff*, as well as evidence relating to Syria's support for the Islamic State presented in several other FSIA cases. *Atkins*, 332 F. Supp. 3d at 11. In addition, of course, the Court considers Plaintiff's own evidence as well.

### B.    Factual Background

#### 1.    Syria and the Rise of ISIS

Ample evidence shows that Syria provided safe haven and support to terrorist organizations within its borders for decades, including the organization that would morph into ISIS. *See Sotloff*, 525 F. Supp. 3d at 127; 45 Fed. Reg. 33956 (May 21, 1980); ECF No. 1 ("Compl.") ¶ 24. In the early 2000s, the Zarqawi organization, or network—a predecessor to ISIS—operated from Syrian territory and received funding and resources from Syria. *See Sotloff*, 525 F. Supp. 3d at 127; *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193–95 (D.D.C. 2017); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 59–63 (D.D.C. 2008). Syrian support for the Zarqawi organization increased following the United States' invasion of Iraq in 2003. *See Sotloff*, 525 F. Supp. 3d at 128. Motivated by the desire to bog down the U.S. forces fighting in Iraq and to divert extremist groups away from attacks against the Syrian regime, Syria allowed the Zarqawi organization to operate unfettered within its borders and acted as a "transit station" for terrorists on their way to Iraq. *Id.* During this time, the Zarqawi organization operated with the "knowledge and permission" of the Syrian regime. *Id.*

After the beginning of the Arab Spring uprising in 2011, Syria's support for terrorist groups within its borders became a "matter of survival" for the regime, as former Syrian President Bashar al-Assad tried to hold onto power. *Sotloff*, 525 F. Supp. 3d at 128–29; Compl. ¶ 25 ("[T]he Assad Regime came to rely on ISIS for its very existence."). Syria's support took several forms: it

3

released hundreds of extremists from Syrian prisons, many of whom then became senior ISIS leaders, *Sotloff*, 525 F. Supp. 3d at 129; Compl. ¶¶ 27–28, it purchased oil and wheat from ISIS, allowing the group to raise revenue, *Sotloff*, 525 F. Supp. 3d at 129; Compl. ¶ 32, and it served as an intermediary allowing ISIS access to the international banking system, *Sotloff*, 525 F. Supp. 3d at 129–30. The Syrian miliary also "cooperated" with ISIS, refraining from attacking ISIS forces and facilitating ISIS's attacks on moderate opposition forces. *Id.* at 130; *see* Compl. ¶ 37. As this Court concluded, this cooperation "allowed ISIS to conquer and hold cities such as Aleppo and Raqqa, without which it would not have been able to kidnap and hold hostages there." *Sotloff*, 525 F. Supp. 3d at 130.

### 2. Foley's Kidnapping, Torture, and Beheading

Foley was abducted in Syria on November 22, 2012, while he and another journalist were heading towards the Turkish border in a taxi. *Sotloff*, 525 F. Supp. 3d at 131; Compl. ¶¶ 40–41. While it is unclear who his original abductors were, by at least March 2013 he was being held by ISIS. *Sotloff*, 525 F. Supp. 3d at 131; Compl. ¶ 42. While in ISIS custody, he endured repeated beatings. *Sotloff*, 525 F. Supp. 3d at 131; Compl. ¶ 42. He was waterboarded, tortured, and starved. *Sotloff*, 525 F. Supp. 3d at 131; Compl. ¶ 42.

On August 13, 2014, members of Foley's family received a message from an ISIS operative indicating that ISIS intended to execute him. Compl. ¶ 46. Six days later, on August 19, 2014, ISIS released a video showing Foley's beheading. *Sotloff*, 525 F. Supp. 3d at 132; Compl. ¶ 47. In the video, Foley was forced to kneel and recite a statement denouncing the United States. *Sotloff*, 525 F. Supp. 3d at 132. His killer was later identified as Mohammed Emwazi, a member of the notorious ISIS cell known as "the Beatles." *Id.*; Comp. ¶ 47.

### 3. Procedural History

Plaintiff sued Syria in November 2022 under the terrorism exception to the FSIA to seek

4

damages for his brother's hostage taking, torture, and extrajudicial killing.  *See* Compl. ¶ 3.  The Clerk of Court mailed a copy of Plaintiff's summons and complaint, along with a translation of each, to the head of the Syrian Foreign Ministry through an international courier under 28 U.S.C. § 1608(a)(3).  ECF Nos. 14–15.  After the summons was returned unexecuted, the Clerk sent the same materials to the State Department to carry out diplomatic service pursuant to 28 U.S.C. § 1608(a)(4).  ECF No. 20.  Service was effectuated on Syria through the Embassy of the Czech Republic in Damascus in October 2023.  ECF No. 22.

Syria did not respond to the complaint or otherwise appear to defend itself.  In September 2024, the Clerk of the Court entered default judgment against Syria.  ECF No. 24.  Later that year, Plaintiff moved for default judgment.  ECF No. 25.

## II.   Legal Standards

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," so "'the default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Still, "entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  A court retains its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action.  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.  And "plaintiffs retain 'the burden of proving personal jurisdiction, [and] they can satisfy that burden with a prima facie showing.'"  *Id*. at 7 (emphasis removed) (quoting *Edmond v. U.S. Postal Serv.*

5

*Gen. Couns.*, 949 F.2d 415, 424 (D.C. Cir. 1991)).  In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id*.

"When default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea,* 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (alteration in original) (quoting 28 U.S.C. § 1608(e)).  And courts must apply that standard mindful that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and to "punish foreign states who have committed or sponsored such acts and deter them from doing so in the future," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002).

As a result, the D.C. Circuit has instructed that "courts have the authority—indeed . . . the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).  To be sure, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  But uncontroverted factual allegations supported by admissible evidence may be taken as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).  And § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).

In a FSIA default proceeding, a court can find that the evidence presented is satisfactory

6

"when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding." *Owens*, 864 F.3d at 785(citations omitted). "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id*. Thus, courts are given "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Id*. And this discretion extends to the admission of expert testimony, often "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id*. at 787 (citations omitted).  Moreover, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate" and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Id*. For these reasons, the D.C. Circuit has recognized that "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id*.

### III. Analysis

The Court finds that it has subject-matter jurisdiction over Plaintiff's claims, again finds Syria liable for Foley's hostage taking, torture, and extrajudicial killing, and awards Plaintiff damages of just over $11 million.

### A. Subject-Matter Jurisdiction under the FSIA

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in a United States court." *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017). Under 28 U.S.C. § 1330(a), district courts have jurisdiction over (1) "any nonjury civil action" (2) "against a foreign state" (3) for "any claim for relief *in personam*," but only if (4) the state "is not entitled

to immunity." (emphasis added).  The first three requirements are met.  Plaintiff "ha[s] not sought a jury trial," "Syria is a foreign state," and "the suit is brought against Syria in its capacity as a legal person, not against property."  *Mueller v. Syrian Arab Republic*, 656 F. Supp. 3d 58, 76 (D.D.C. 2023).

Thus, immunity is remaining jurisdictional hurdle.  Typically, foreign states are "immune from the jurisdiction" of United States courts.  28 U.S.C. § 1604.  The FSIA's terrorism exception, however, nullifies that immunity—and thus unlocks jurisdiction—when the lawsuit seeks "money damages" for "personal injury or death."  *Id*. § 1605A(a)(1).  More precisely, the personal injury or death must have been "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  *Id*.  The act (or provision of support) must also have been "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  *Id*.

Relevant here, Plaintiff must prove four elements to establish subject-matter jurisdiction under the terrorism exception: (1) the foreign state was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed; (2) the claimant or victim was a national of the United States at the time of the act; (3) the claimant afforded the foreign state a reasonable chance to arbitrate the claim; and (4) the damages sought are for personal injury or death caused by the act of terrorism.  *See Akins*, 332 F. Supp. 3d at 32; 28 U.S.C. § 1605A.  Plaintiff has met his burden on all four elements.

### 1. The United States Designated Syria a State Sponsor of Terrorism

The State Department designated Syria a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated ever since.  *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33956 (May 21, 1980).

### 2. Plaintiff is a U.S. National

Plaintiff was at all relevant times a United States citizen. ECF No. 25-1 at 8. And United States citizens are nationals for purposes of the FSIA. *See* 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

### 3. Plaintiff Offered to Arbitrate His Claims

"[T]he FSIA 'does not require any particular form of offer to arbitrate, simply the extension of a reasonable opportunity.'" *Warmbier*, 356 F. Supp. 3d at 45 (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya* ("*Simpson I*"), 326 F.3d 230, 234 (D.C. Cir. 2003)). Plaintiff included an offer to arbitrate, as well as a translation of that letter into Arabic, with the summons and complaint served on Syria through diplomatic cover. ECF No. 23. Syria did not respond. As a result, this element is satisfied. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 66 (D.D.C. 2015); *Simpson I*, 326 F.3d at 233.

### 4. Syria's Actions Qualify for the Terrorism Exception

The fourth element of subject-matter jurisdiction under the FSIA terrorism exception is that the plaintiff seeks damages for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Plaintiff alleges that ISIS took his brother hostage, and then tortured and killed him, and that Syria's provision of material support to ISIS caused such acts. *See* ECF No. 25 at 3. As a result, Plaintiff alleges that he was injured. *Id.* at 19–20. On all counts, he has met his burden.

#### a. Hostage Taking, Torture, and Extrajudicial Killing

Hostage taking under the FSIA is defined by Article 1 of the International Convention against the Taking of Hostages. 28 U.S.C. § 1605A(h)(2). Article 1 states:

9

> Any person who seizes or detains and threatens to kill, to injure, or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages.

International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 18 I.L.M. 1456, 1316 U.N.T.S. 205.  Thus, hostage taking has two elements: (1) an abduction or detention and (2) the purpose of accomplishing "the sort of third-party compulsion described in the [C]onvention." *Simpson v. Socialist People's Libyan Arab Jamahiriya* ("*Simpson II*"), 470 F.3d 356, 359 (D.C. Cir. 2006) (alteration in original) (quoting *Price*, 294 F.3d at 94).  Even so, purported hostage-takers need not have communicated their purpose to the third party whose behavior they intend to compel.  *Id*. at 360–61.

The FSIA's definition of torture is imported from the Torture Victim Protection Act ("TVPA").  28 U.S.C. § 1605A(h)(7).  Under that statute, "torture" is:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73 (Mar. 12, 1992), *codified at* 28 U.S.C. § 1350 (note).  Through its cross-reference, the FSIA also provides that "mental pain or suffering" means "prolonged mental harm caused by" one of the following: "the intentional infliction or threatened infliction of *severe* physical pain or suffering," the use or threatened use of "mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality," "the threat of imminent death," or the threat that another person "will imminently be subjected" to any of the above.  *Id.* (emphasis added).

The state-sponsored terrorism exception to the FSIA also defines "extrajudicial killing" through reference to the TVPA. 28 U.S.C. § 1605A(h)(7). Under the TVPA, an "extrajudicial killing" is:

> [A] deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), *codified at* 28 U.S.C. § 1350 (note). This definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770.

In *Sotloff,* this Court dealt with the requirements for hostage taking, torture, and extrajudicial killing at length, concluding that based on the evidence before the Court—including expert reports, contemporaneous evidence, and the account of Henin, the French journalist who was held with Foley but ultimately released—each were satisfied with respect to Foley. ISIS was responsible for holding Foley and threatening to kill, injure, and keep detaining him to compel the United States to make concessions and refrain from military action, and it tortured and ultimately beheaded him. *Sotloff*, 525 F. Supp. 3d at 132–38. Based on the same evidence and for the same reasons, the Court reaches the same conclusions again.

### b. Syria's Material Support to ISIS and Causation for Foley's Hostage Taking, Torture, and Extrajudicial Killing

The final requirement under § 1605 is a showing that Foley's abduction, torture, and beheading was "caused by . . . the provision of material support or resources" to ISIS by "an official, employee, or agent" of Syria. 28 U.S.C. § 1605A(a)(1). The state-sponsored terrorism exception to the FSIA defines "material support or resources" as having the meaning provided in 18 U.S.C.

11

§ 2339A:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). And under the FSIA, a plaintiff need only show proximate cause. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). This requires a showing of a "reasonable connection between the material support provided and the ultimate act of terrorism." *Foley*, 249 F. Supp. 3d at 204 (quoting *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011)) (cleaned up). So Plaintiff must establish (1) that Syria's provision of material support was a "'substantial factor' in the sequence of events" that led to Foley's hostage taking, torture, and extrajudicial killing, and (2) that Foley's injury was "'reasonably foreseeable or anticipated as a natural consequence' of [Syria's] conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

Again, the Court considered this requirement in *Sotloff*. There, the Court found, based on the evidence before it, that "Syria provided material support to ISIS," including "through the release of prisoners, financial assistance in the form of oil purchases and access to the international financial system, and strategic military cooperation that served the needs of the Assad regime" which fit the definition of material support under 18 U.S.C. § 2339A(b)(1). *Sotloff*, 525 F. Supp. 3d at 138–39. And the Court found that "Syria's aid to ISIS was, at the very least, a substantial factor in the sequence of events that led to Foley's . . . hostage taking, torture, and extrajudicial killing," *id.* at 139, because Syria's material support to ISIS was "a substantial factor in in its development into a wealthy proto-state with sophisticated, battle-hardened leadership that controlled large swaths of territory." *Id.* The Court also found that Foley's imprisonment, torture,

12

and death was a "'reasonably foreseeable' consequence[] of Syria's prisoner release, financial support, and military aid." *Id.* at 139–40; *see also Foley*, 249 F. Supp. 3d at 193–95 (finding Syria liable for terrorist acts committed by the Zarqawi organization); *Thuneibat*, 167 F. Supp. 3d at 36 ("[P]laintiffs have established that these suicide bombers were trained, funded, and sent by Zarqawi and his organization . . . which received material support and resources from [Syria]."); *Gates*, 580 F. Supp. 2d at 59–63 (finding Syria provided material support to the Zarqawi organization through serving as a "logistical hub" and facilitating transportation of terrorists into Iraq, providing sanctuary to terrorists, and financing Zarqawi and his network).

For these reasons, the Court concludes that all § 1605 elements are satisfied and finds it has subject-matter jurisdiction over Syria.

### B. Personal Jurisdiction over Syria

The Court has personal jurisdiction over Syria if it has subject-matter jurisdiction over Plaintiff's claims and Syria was properly served. *See* 28 U.S.C. § 1330(b). As explained above, the Court has subject-matter jurisdiction. And as detailed below, Plaintiff properly served Syria through the State Department.

The FSIA provides four ways to serve a foreign state. *See* 28 U.S.C. § 1608(a). The first two options are unavailable because Syria and the United States have no "special arrangement for service," *see id.* § 1608(a)(1), and because Syria is not party to an "applicable international convention on service," *see id.* § 1608(a)(2). Method three entails asking the Clerk of Court to "send[] a copy of the summons and complaint and a notice of suit," with translations of each, "to the head of the ministry of foreign affairs" of Syria. *Id.* § 1608(a)(3). And the last resort is requesting that the Clerk send two copies of those materials to the State Department so that "service can be effected through diplomatic channels." *Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 81 (D.D.C. 2021) (citing § 1608(a)(4)).

13

Plaintiff tried option three in January 2023, but that did not work. *See* ECF Nos. 8–16. Thus, in May 2023, Plaintiff asked the Court to begin preparing for the fourth option. ECF No. 19. In October 2023, the State Department confirmed that the service documents had been delivered to the Syrian Ministry of Foreign Affairs through the Czech Embassy in Damascus. ECF No. 22. Thus, Plaintiff "satisfie[d] § 1608(a)(4)," which establishes personal jurisdiction over a foreign state like Syria. *Saberi*, 541 F. Supp. 3d at 81 (citation omitted).

### C.   Syria's Liability to Plaintiff

Courts have taken two approaches when assessing a foreign state's liability to plaintiffs bringing claims under the FSIA. The first reasons that the immunity-waiver inquiry and liability question are conceptually distinct but functionally overlapping. That is, a plaintiff who "establish[es] a waiver of foreign sovereign immunity under § 1605(a)" also "establish[es] entitlement to relief as a matter of federal law." *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 176 (D.D.C. 2020). "Essentially," then, "liability under § 1605A(c) will exist whenever the jurisdictional requirements" are met. *Hekmati*, 278 F. Supp. 3d at 163. So under this analysis, Plaintiff has established that Syria is liable for his injuries because he has proven that Syria's material support was a proximate cause of ISIS's underlying acts. *See, e.g.*, *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).

The result is the same under the second approach. On this view, § 1605A(c) creates a private right of action but "provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 178 (D.D.C. 2019). So a FSIA plaintiff must still "prove a theory of liability found in well-established principles of law, such as those found in the Restatement (Second) of Torts." *Saberi*, 541 F. Supp. 3d at 81 (quotation marks and citation omitted). Plaintiff claims intentional infliction of emotional distress as his theory of liability. Compl. ¶¶ 49–51 (Claim I).

A claim of intentional infliction of emotional distress requires proof that Syria, "by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to [him]." *Rezaian*, 422 F. Supp. 3d at 179 (cleaned up) (citation omitted). Because Plaintiff was not himself the "direct recipient of the 'extreme and outrageous conduct,'" he must show he is a "member of" Foley's "immediate family." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81 (D.D.C. 2017) (quoting *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26–27 (D.D.C. 2009)). And because he was not physically "present at the time" of that conduct, he must also show that the underlying actions were "sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Id.* (alteration in original) (quoting *Est. of Heiser*, 659 F. Supp. at 26–27). Hostage cases, after all, "implicitly involve a physical separation of the plaintiff from the victim." *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 (D.D.C. 2001). And because the "plaintiff's lack of presence is the *exact source* of his emotional distress," permitting recovery for non-present plaintiffs makes sense if they show sufficiently outrageous conduct. *Id.* (emphasis in original).

Plaintiff has sufficiently shown that Syria is liable to him for Foley's detention, torture, and execution under an intentional infliction of emotional distress theory. To begin, as Foley's brother, he is an immediate family member. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010). In general, "hostage taking and torture" are "sufficiently outrageous to inflict severe emotional harm on family members who were not present" for the acts. *Rezaian*, 422 F. Supp. 3d at 179; *see also Kar v. Islamic Republic of Iran*, Nos. 19-cv-2070, 19-cv-2602 (JDB), 2022 WL 4598671, at *17 (D.D.C. Sep. 30, 2022). More specifically, the egregious conduct here—including the public release of a video of Foley's beheading—was plainly "sufficiently outrageous to inflict severe emotional harm" on his brother. *Rezaian*, 422 F. Supp. 3d at 179; *see*

15

Compl. ¶¶ 46–47; *Sotloff*, 525 F. Supp. 3d at 132. Plaintiff, for his part, has presented sufficient evidence of the severe emotional distress his brother's death caused him. *See* ECF No. 25-1 at 53–59. As described below, the brothers were especially close, as both children and adults. And Plaintiff played an especially prominent role among his family members in advocating for his brother's release, communicating with components of the U.S. government, and negotiating with ISIS operatives. *See* ECF No. 25 at 23–25; ECF No. 25-1 at 32–42.

## IV. Damages

FSIA provides for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). Plaintiff seeks compensatory and punitive damages, which the Court will award in the amount requested.

### A. Compensatory Damages

Plaintiff seeks compensatory damages for the emotional injury he suffered during his brother's captivity and after his brother's death. Such "solatium" damages try to compensate for "the mental anguish, bereavement[,] and grief that those with a close personal relationship" to the victim "experience," as well as the harm resulting from the loss of the victim's "society and comfort." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (citation omitted). Claims for solatium damages are "indistinguishable from" a claim for intentional infliction of emotional distress. *Murphy*, 740 F. Supp. 2d at 75 n.4 (citation omitted).

In *Sotloff*, following this Court's entry of default judgment for Foley's estate, his parents, and his other siblings, it referred the matter to a special master for a calculation of compensatory damages, and the Court subsequently adopted the special master's report in full. *Sotloff v. Syrian Arab Republic*, No. 16-cv-725 (TJK), 2023 WL 2727599, at *1 (D.D.C. Mar. 31, 2023).

Plaintiff urges the Court to rely on the calculations of the special master in *Sotloff*, as well as the *Heisler* framework to make its compensatory damages calculation. ECF No. 25 at 22. He

16

also requests a 50% upward departure from the *Heisler* framework to account for his especially close relationship with his brother and his direct involvement in the failed negotiations for this brother's release, for a total of $3.75 million in compensatory damages. *Id.* Relying on Plaintiff's evidence, the Court's analysis in *Sotloff*, and the approaches of other courts in this District in similar cases, the Court agrees that Plaintiff's request reflects an appropriate award of compensatory damages.

"[Q]uantify[ing] the distress that results when a loved one is taken away" is "undeniabl[y]" challenging. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C. 2012). Courts in this District, however, typically follow the "framework . . . established in *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006)." *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 130 (D.D.C. 2019). For the siblings of individuals killed in terrorist attacks, Courts in this district have typically awarded about $2.5 million. *See Heiser*, 466 F. Supp. 2d at 269. In *Sotloff*, the special master recommended, and this Court adopted, an upward deviation of 25% from the *Heiser* framework for Foley's siblings Mark Foley and Kathryn Foley Simpson, and an upward deviation of 30% for Foley's brother John Elliot Foley. *See Sotloff v. Syrian Arab Republic*, No. 16-cv-725 (TJK), 2022 WL 22902285, at *23 (D.D.C. May 20, 2022). The upward deviations recommended by the special master and approved by this Court in *Sotloff* resulted from the especially egregious and harrowing circumstances of Foley's abduction, torture, and murder. *Id.* at *22. As the special master concluded:

> [T]he family spent an agonizing nine months not knowing whether James was alive or dead. Then, when they learned he was alive, they faced a hopeless situation . . . [d]espite their extensive efforts, they could not secure his release. They knew that James likely was facing abuse and deprivation. His execution was intentionally brutal and horrific – solely for the purpose of creating maximum terror and issuing a warning to the United States. And the video makes clear that James was under extreme duress when he was forced to denounce his family and government. The family then faced the very public reaction to the death of their family member.

*Id.*

Plaintiff argues that special circumstances in his case warrant an even greater deviation from the *Heiser* framework. ECF No. 25 at 22. As the closest sibling in age to his brother, Plaintiff testified that he and his brother had been "exceptionally close" since their childhood. *See Id.* at 22–34; ECF No. 25-1 at 9–10. Even into adulthood, the two "talk[ed]" almost daily, ECF No. 25-1 at 13, and Plaintiff provided his brother financial and logistical support for his career as a journalist, ECF No. 25 at 24, ECF No. 25-1 at 16. For a time, Foley lived with Plaintiff and his wife and children, and he developed a "special bond" with Plaintiff's sons. ECF No. 25 at 24, ECF No. 25-1 at 20. In addition, Plaintiff "took the lead" in advocating for his brother's release with the State Department and FBI, as well as with ISIS operatives. ECF No. 25 at 24; ECF No. 25-1 at 33–34. Plaintiff remains haunted by the "regret and guilt" from the failed negotiations to release his brother. ECF No. 25 at 24; *see* ECF No. 25-1 at 33–34. And Plaintiff was the only one of Foley's family members who testified in the criminal trial of two of his brother's captors. ECF No. 25 at 25; Ex. 1 at 48–49. In doing so, he had to identify his brother's severed head. ECF No. 25 at 25; ECF No. 25-1 at 48–49. Unsurprisingly, Plaintiff attests to the severe effects that his brother's death has had on his mental and physical health. ECF at 26; ECF No. 25-1 at 53. The experience has impacted his work, his relationship with his spouse, and his family life. ECF at 26; ECF No. 25-1 53–57.

For all these reasons—including the circumstances of Foley's prolonged captivity and murder, as well as Plaintiff's relationship with his brother and his role when his brother was held hostage—the Court finds that Plaintiff's requested 50% upward departure from the *Heisler* framework is reasonable and appropriate. Thus, the Court will award Plaintiff $3.75 million in compensatory damages.

### B. Punitive Damages

Plaintiff also requests punitive damages. These damages aim to "punish and deter" the defendant, and they "are appropriate in cases involving 'outrageous conduct.'" *Hekmati*, 278 F. Supp. 3d at 166 (citation omitted). For cases like this one, "[c]ourts have repeatedly held" that the actions of similarly placed State defendants were "outrageous" and justified "substantial punitive damages awards." *Rezaian*, 422 F. Supp. 3d at 183. The four factors used by courts in deciding whether to award punitive damages are: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 WL 5422844, at *17 (D.D.C. Sept. 10, 2020) (quoting *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)).

In *Sotloff*, this Court found that a "substantial award" of punitive damages was justified: the underlying act was "nothing short of horrific," and the harm caused by Syria's material support to ISIS was "unquantifiable." *Sotloff v. Syrian Arab Republic*, No. 16-cv-725 (TJK), 2023 WL 2727599, at *2 (D.D.C. March 31, 2023). The Court recognized the "need to deter sovereign states like Syria" from facilitating terrorist acts like this one. *Id.* And "Syria's vast wealth" supports such an award. *Id.* Considering all the circumstances, as well as similar awards given by other courts in this District, this Court awarded punitive damages of two times Plaintiff's compensatory damages. *Id.* For the same reasons, it will do so again. Thus, the Court will award Plaintiff $7.5 million in punitive damages.

### C. Post-Judgment Interest

Finally, Plaintiff asks for—and is entitled to—post-judgment interest. *See* Compl. at 16. Congress has provided that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Applying this statute "is mandatory, not

19

discretionary." *Winternitz v. Syrian Arab Republic*, No. 17-cv-2104 (TJK), 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022) (citation omitted). This interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." 28 U.S.C. § 1961(a). Further, "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually." *Id.* § 1961(b). So the Court will grant Plaintiff's request for post-judgment interest at the statutory rate.

## V.   Conclusion

For all the above reasons, the Court will grant Plaintiff's Motion for Default Judgment and award him $3.75 million in compensatory damages and $7.5 million in punitive damages, for a total of $11.25 million, as well as post-judgment interest. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 25, 2025